112

UNITED STATES *v.* FREEDMAN & SLATER, INC. (HOUSEHOLD
UTILITIES MFG. CORP.) (No. 4090)[1]

United States Court of Customs and Patent Appeals, October 25, 1937

*Joseph R. Jackson,* Assistant Attorney General (*Daniel I. Auster* and *Dorothy C. Bennett,* special attorneys, of counsel), for the United States.
*John R. Rafter* for appellees.

[Oral argument October 4, 1937, by Mr. Auster and Mr. Rafter]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellees imported at the port of New York, in the period from August to December 1933, under the Tariff Act of 1930, several cases of bread-slicing machines of three types, which were described on the invoices as numbers 116, 119, and 120. These were appraised by the local appraiser at what was considered by him to be their foreign values; namely, "Marks 3.70, Marks 5.29, and Marks 8.38, respectively." The only evidence in the case was furnished by the testimony of Charles W. Bunn, examiner, who testified that he made the appraisement, and a written report by Erwin G. May, a Treasury attaché. The appeal to reappraisement was made by the importers.

[1] T. D. 49241.

For the purpose of a better understanding of the evidence, we give the following résumé:

Charles W. Bunn, the examiner of merchandise at the port of New York, called on behalf of the importers, testified that he examined and appraised the merchandise in question. He stated that he appraised the same at the foreign value of "similar, practically identical merchandise." In determining the foreign values of the imported merchandise, he stated that he "took the price at which the commissioner who made the investigation in Germany reported was the price at which it was sold." This he explained by saying that he took "the price of a similar machine sold in Germany, as reported in the special agent's report." After this he stated that he "made an adjustment of that price to cover what the report showed was the actual difference between—which the report stated was the actual difference between the machine exported and the machine sold in the home market." He stated further, as to No. 116, "I took the foreign market value of a similar machine as reported, and I added for what the commissioner's report said was the actual difference between that machine and the ones sold in the home market." Again he stated, "I made my figures on that report." He further stated that he did the same thing with all three types of the machines. As to No. 116, he said, "I took the foreign market statement of value (w)as 3 Marks, and I added Mark 1.20 for difference in the turn-screw and the Chrome knife, and I deducted 10 per cent from that, giving me Marks 3.70, plus cases, as my appraised value." As to No. 119, he said, "I took the par and selling price of similar machine at Marks 4.50; I added 1.50 for difference in the turn-screw and the Chrome knife, and I deducted 10 per cent, giving me a net value of Marks 5.29, plus cases." As to No. 120, he said, "120 sold in the home market at 8 Marks. I added 1.50 for the turn-screw and Chrome knife, deducted 10 per cent, giving me a net valuation of Marks 8.38, plus cases." He further stated that he also made a deduction of 2 per centum for cash. The following question and answer then appear:

Q. * * * Mr. Bunn, are these machines in question or similar machines freely offered for sale in Germany for exportation to this country to all purchasers? —A. Well, apparently not. There is only one importer.

The special agent's report, with prices, was then introduced in evidence. In the cross-examination of Bunn, when asked whether the report stated that both types of machines were sold in Germany, that is, those with the screw arrangement and those without it, he stated: "Yes; the report so says."

The following questions and answers then appear:

X Q. Didn't you use the price list in making your appraisement?—A. Not at all. The price list is stated by the special agent not to be used. It was not

used by the manufacturer in any of his sales; absolutely disregarded. He makes his sales without any regard to the price lists; and I paid no attention to the price list, as it was apparently an obsolete price list.

X Q. Well, is there anything on the price list to show that it is obsolete?—A. On the price list?

X Q. Yes.—A. I couldn't even tell you. I haven't examined the price list, because of the fact that it was reported to me to be of no value whatever in the appraisal of this merchandise.

Judge DALLINGER. Where did you get that information?

The WITNESS. In that report. The manufacturer himself pays no attention whatever, the special commissioner says, to his old price list, which is the only one he has. The price list was forwarded with the report, in spite of the fact that he says it is of no value.

The witness stated that he had noted that in the report "the manufacturer stated that for machines equipped with the turn-screw the cost is increased by RM 0.80 per machine." Asked whether he paid any attention to that, he said: "I took the 1.50; but he further stated that for both the Chrome plating and Chrome plated knife and the screw there should be a difference of 1.50; and the imported article has both of those articles."

Further in the cross-examination the witness stated:

X Q. Well, did you make any effort to compare the prices in the invoice sales in Germany with the price list?—A. I did not.

X Q. Well, then, you don't know whether it does or not; do you?—A. I told you that I used that report as a basis of my appraisement.

Further, the witness, when asked whether he made adjustments to obtain a value, said: "I assumed from the report that the machines sold in Germany did not have this particular screw." He further stated that all of the imported articles had the extra screw.

The report of the Treasury attaché, introduced in evidence on behalf of the Government, recites, among other things, that the packing charges are included in the selling price of these articles; that "Bread-slicing machines both identical and similar to those exported to the Household Utilities Mfg. Corporation are freely offered for sale in Germany by Suse & Groger." It was also stated that the imported machines are "principally an export item," and that the demand for them in Germany is light; that the machines are equipped with two types of adjusting screws, one being the ordinary type set into a slotted metal slide, and the other being a threaded turn-screw which permits of easier adjustment. The report further recites: "Mr. Groger stated that for machines equipped with the turn-screw the cost is increased by RM 0.80 per machine"; that no printed pricelist was issued, but that there was an office pricelist, a copy of which was attached to the report; and that the numbers shown on the commercial invoice to the importers are the importers' call numbers, Nos. 116,

119, and 120, and that these correspond to the machines indicated on the office pricelist with an asterisk, as follows:

No. 120, same as aluminum machine "Europa," 22/19 cm.
No. 119, same as cast-iron machine SG 19/19 cm. or 1019/19 cm.
No. 116, same as cast-iron machine SG 16/16 cm.

Mr. Groger also added the pencil notation to the price list, Exhibit "A", that if the foregoing machines were sold inland, equipped with turn-screw and chromed knife, the following plussages would be added:

|  | Rm. |
|---|---|
| For type "Europa" | 1.50 per machine. |
| For type SG 19/19 or 1019/19 | 1.50 per machine. |
| For type SG 16/16 cm | 1.20 per machine. |

The report also recites that the exporters "do not adhere to the prices and discounts shown in their price list." Then follows a notation of a number of sales, after which it is stated: "In making a comparison between the export and inland prices, Mr. Groger stated that plussages for turn-screw and chromed knives must be added to the foregoing inland prices." Then follows a list of sales of various numbers showing additions for turn-screw and chrome knife, comparing sales in Germany with sales to the importers.

As a result of the hearing before the single judge, the appraisement of the local appraiser was modified and a foreign value was ascertained by the single judge, by which the value was fixed, as follows: "For 116 machine, 2.65 marks, cases extra; for 119 machine, 3.97 marks, cases extra; and for 120 machine, 7.06 marks, cases extra,"—however, calling attention to the fact that the entered values for the 116 and 119 machines were higher than their dutiable values.

An appeal for review was prayed by the Government, and, on hearing before the First Division of the United States Customs Court, one judge dissenting, the decision of the single judge was modified, and a foreign value was found by the division, as follows: No. 116, 3.25 reichsmarks; No. 119, 4.50 reichsmarks, cases extra; and No. 120, 7.06 reichsmarks, cases extra.

The single judge, in coming to his conclusion, was of the opinion that the appraiser had arbitrarily added to the basic price of these respective types of machines, as they were sold in Germany, additional amounts taken from the prices of other machines; to wit, an addition for a turn-screw and a chromium knife, and that the machines with this type of equipment were not shown to be sold in the foreign market and hence could not be taken as a part of the value of such or similar machines on the foreign market. In this way the sums added for turn-screws and chromium knives by the appraiser were rejected, and only the basic price taken.

The division, on review, affirmed the decision of the single judge as to the foreign value of type 120, but disagreed with his decision as to the foreign values of types 116 and 119, holding them to be, respec-

tively, 3.25 reichsmarks and 4.50 reichsmarks, cases extra, and from that decision the Government appealed. This disagreement in value arose from a conclusion of the division that other reports of actual sales recited by the attaché in his report, showed actual sales to customers in Germany during the time in question, as per such final judgment by the division.

The claim of the Government is that there is no evidence in the record, of any kind, upon which the final judgment of the appellate division can be based; that there is a foreign value of the goods in question, and that such foreign value has been properly ascertained by the local appraiser, except as to a discount of 10 per centum, to which we shall hereinafter refer; and that the judgment of the appellate division should be, therefore, reversed, and the matter remanded for further action.

The determination of the whole matter, as we see it, rests upon a reading and construction of the testimony in the record. Is there any substantial evidence in the record to show that the values returned by the appraiser were not the market values, or prices at the time of exportation of the goods in issue at which such or similar merchandise was freely offered for sale to all purchasers in the home market in the usual wholesale quantities in the ordinary course of trade, as foreign value is defined in section 402 (c) of the Tariff Act of 1930? Presuming, as we must, that the appraiser's report was based upon proper information, has anything appeared in the testimony which overcomes this presumption? On the part of the importers, it is claimed that the values which were obtained by the local appraiser were based upon an erroneous theory, and that he had no right to take a part of the values of two different machines, add them together, and thus compute a value. In this view the courts below agreed with the importers. On the other hand, the Government contends that what the appraiser did. was to ascertain the foreign values of these three types of machines from the report of the Treasury attaché; that in so doing he was within the law, and proceeded properly; and that there is nothing to indicate the contrary, except as to the 10 per centum discount which has been heretofore alluded to, and which will be taken up later.

When the matter came before the reappraising judge, the burden rested upon the importers there to overcome the presumption of correctness raised by the appraiser's valuation, by evidence of the incorrectness of such finding. The evidence upon which the appellees must rely in this respect is the testimony of their witness Bunn and the Treasury attaché's report. As summarized, the testimony of Bunn is that he based his appraisement upon the report of the commissioner who made the investigation in Germany; that he took the

price of a similar machine sold in Germany as the basis for the valuations of the various types of machines; and that he took the values of the ordinary types of machines, as sold in Germany, and added amounts thereto, as shown by said report for the machines as they were imported, making other adjustments of discounts to ascertain the correct valuation. While there was a pricelist attached to the attaché's report he did not use this, thinking it was obsolete. As to the increased amount for a turn-screw and a chrome plated knife, such as were used in the imported articles, these were added because of the statements in the Treasury attaché's report, which constituted, according to the view of the appraiser, the true foreign value of machines such as were imported here.

In the report of the Treasury attaché, it appears that bread-slicing machines, both identical and similar to those imported by the Household Utilities Mfg. Corp. herein, are freely offered for sale in Germany by the exporters, but that the type of machines bearing the turn-screw and chrome knife are principally exported and that the demand for them in Germany is light; that the screws for adjustment are of two types—one of the ordinary type, set into a slotted metal slide, and the other being a threaded turn-screw, and that the manufacturer stated that where the adjustable turn-screw is used, the price is increased by 0.80 reichsmark per machine, and that if machines such as were imported here were sold in Germany, the basic price was increased on type 120, 1.50 reichsmarks per machine, on type 119, 1.50 reichsmarks per machine, and on type 116, 1.20 reichsmarks per machine.

It thus appears from the testimony of Bunn and the Treasury attaché's report that the identical machines imported here were sold and offered for sale in Germany, and that when so offered or sold, the basic price of the machine must be increased by 1.20 or 1.50 reichsmarks per machine, when equipped with a turn-screw and chrome knife, as these imported machines were equipped. The burden was upon the appellee to establish that the foreign value found by the local appraiser did not constitute foreign value. It did not maintain such burden and, hence, there is no substantial evidence in the record to sustain a finding that the values found by the local appraiser were not the correct foreign values of the imported machines.

The single judge was of opinion, on the supposed authority of *United States* v. *Irving Massin & Bros.*, 16 Ct. Cust. Appls. 19, T. D. 42714, and *United States* v. *Alatary Mica Co.*, 19 C. C. P. A. (Customs) 30, T. D. 44871, that the appraiser had no right to add the amounts of 1.20 and 1.50 reichsmarks for turn-screw and chrome knife attachments, and, therefore, deducted these amounts from the appraisement by the appraiser, fixing the values in this way.

The appellate division apparently agreed with the single judge in his theory that the additions were improper, in view of the facts, but found values according to certain prices which it found in the Treasury attaché's report of specific sales, thus arriving at somewhat different valuations than the amounts fixed by the single judge. The basic theory, however, upon which appraisement of the local appraiser was held to be erroneous was that he proceeded illegally in adding the so-called arbitrary amounts for turn-screw and chrome knife, and that the true foreign value should be found by taking the foreign values of the various machines, not as they were imported but as they were sold in Germany; without the turn-screws and chrome knives. In reciting the facts on this feature of the case, it will be observed that the decision states, *inter alia*, "that the machines sold in Germany did not have this particular screw, and all the imported machines did and a chromium knife in addition." In this quotation the court was in error. What the witness said was, "I assumed from the report that the machines sold in Germany did not have this particular screw."

The case of *United States* v. *Irving Massin & Bros., supra,* does not throw much light on the situation here. In that case certain hatters' plush was imported. The question was one of similarity of the imported goods to certain goods sold in the home market. There it was said that a value cannot be fixed by comparison, by taking some proportionate part of a foreign value of comparable goods of a different grade or value. "It must be *the value or price* of *such* or *similar* goods." However, the goods by which the value was attempted to be fixed in that case were not "such or similar."

In the case of *United States* v. *Alatary Mica Co., supra,* it was held that the foreign value of certain inferior mica could not be fixed by comparing it with the value of first grade mica. In the cited case, also, there were different articles involved, and not "such or similar articles" as are here involved.

The court is of the opinion that the offered evidence did not overcome the presumption of correctness of the local appraiser's report, and that there is an entire absence of proof sustaining the decision of the appellate division. As a matter of law, therefore, it should be reversed.

The Government challenges, for the first time, that item in the valuation which allows to the importer a deduction of 10 per centum upon delivery of 100 pieces. It is claimed this allowance is not justified by any evidence in the record, and that the error of allowance of this item may be corrected here on the authority of *Happel & Mc-Avoy (Inc.)* v. *United States,* 16 Ct. Cust. Appls. 161, T. D. 42791.

When the appraisement first came before the trial court, it must be presumed that the appraisement and all items thereof constituted

the true valuation of the merchandise and the burden rested upon the party who challenged its correctness or the correctness of any of its items to prove otherwise. Section 501, Tariff Act of 1930.

The only evidence as to this item of the allowance of 10 per centum discount which appears in the record is that of the witness Bunn who testified that in making the appraisement, he allowed 10 per centum for discount. Appended to the pricelist attached to the Treasury attaché's report was this statement:

Basic Discounts: 33⅓%
    By delivery of 12 pcs. 2½%
    By delivery of 24 pcs. 5% ;
    By delivery of 50 pcs 7½%
    By delivery of 100 pcs. 10%

The appraiser was advised that this pricelist was not used by the exporters, and the witness Bunn stated: "He makes his sales without any regard to the price lists: and I paid no attention to the price list, as it was apparently an obsolete price list." Again, the witness stated that he relied upon the language used by the Treasury attaché, that is: "Examination of numerous inland sales indicates that Suse & Groger do not, adhere to the prices and discounts shown in their price list, Exhibit 'A.' "

It, therefore, appears that there is no evidence in the record as to the source from which the allowance of the item of 10 per centum discount was obtained, nor is anything offered by which the correctness of its allowance may be now attacked. Under the presumption of correctness established by said section 501, its correctness will be presumed. The Government had an opportunity to attack the item in the trial court. Having failed to do so, it is too late to do so now, in view of the condition of the record.

*Happel & McAvoy (Inc.)* v. *United States, supra,* is not in point, it having been decided under the Tariff Act of 1922. See *Golding Bros. Co., Inc.* v. *United States,* 21 C. C. P. A. (Customs) 395, T. D. 46926; *Stone & Downer Co.* v. *United States,* 21 C. C. P. A. (Customs) 479, T. D. 46958.

It is, therefore, the judgment of the court that the judgment of the appellate division of the United States Customs Court be *reversed* and the cause be *remanded* with directions to remand the cause to the single judge with directions to find values in accordance with the appraisement made by the local appraiser.